IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

DONNA KAY WELLS LLOYD,                    *

    Plaintiff,                            *

        v.                               *   CIVIL NO.: WDQ-13-2232

FRONTERA PRODUCE, LTD., *et al.*, *

    Defendant.                            *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Donna Kay Wells Lloyd, personal representative for the
Estate of Clarence D. Wells, sued Frontera Produce, Ltd.
("Frontera") and Primus Group, Inc. ("Primus") in a product
liability suit arising from a 2011 *Listeria* outbreak. ECF No.
38-1.[1] Frontera asserted third-party claims against Pepper
Equipment Corp. ("Pepper Equipment"), Jensen Farms, and Bio Food
Safety, Inc. ("Bio Food Safety").[2] ECF No. 14-1. Pending are
Primus's motion to dismiss for failure to state a claim, ECF No.
19, Pepper Equipment's motion to dismiss for lack of personal
jurisdiction, ECF No. 35, and Lloyd's motions to supplement her
response to Primus's motion to dismiss, ECF No. 37, and to file

---

[1] John Does 1-10 are also named as defendants in this case. ECF
No. 38-1.

[2] There has been inconsistent spelling of "Bio Food Safety." The
Court uses Primus's spelling. *See* ECF No. 19-1.

an amended complaint, ECF No. 38. No hearing is necessary.
Local Rule 105.6 (D. Md. 2014). For the following reasons, the
motion for leave to amend will be granted, the motion to
supplement will be denied,[3] the motion to dismiss for failure to
state a claim will be denied as moot, and the motion to dismiss
for lack of personal jurisdiction will be granted.

I.   Background[4]

     A.   Facts[5]

     This case arises from a 2011 nationwide *Listeria* outbreak
allegedly linked to contaminated cantaloupe grown, distributed,

---

[3] The Court will deny the motion to supplement because the
supplemental exhibit will not aid in this Court's decision
whether to allow Lloyd to amend her complaint. *See Casey v.
Litton Loan Servicing, LP*, Case No. RDB-11-0787, 2012 WL 502886,
at *7 (D. Md. Feb.14, 2012) (denying motion to supplement
opposition to motion to dismiss when the supplement "would not
aid in this Court's decision").

[4] For the motion to dismiss for failure to state a claim, the
well-pled allegations in the complaint are accepted as true.
*See Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011).
In reviewing the motion to dismiss, the Court may consider
allegations in the complaint, matters of public record, and
documents attached to the motion to dismiss that are integral to
the complaint and authentic. *See Philips v. Pitt Cnty. Mem'l
Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). For the motion to
dismiss for lack of personal jurisdiction, "the [C]ourt must
take all disputed facts and reasonable inferences in favor of
the plaintiff[s]." *Carefirst of Md., Inc. v. Carefirst Pregnancy
Centers, Inc.*, 334 F.3d 390, 396 (4th Cir.2003).

[5] Background facts are taken from Lloyd's proposed amended
complaint. ECF No. 38-1. Additional facts relevant to personal
jurisdiction over Pepper Equipment are taken from Frontera's
third-party complaint, ECF No. 14-1, and affidavits by Pepper
Equipment, ECF Nos. 35-2, 39-1.

and sold by Jensen Farms and Frontera.  According to the CDC,[6] 147 persons in 28 states were infected with one of five outbreak-associated strains of *Listeria monocytogenes*.  ECF No. 38-1 ¶¶ 3.1-3.2.  Of those, 33 deaths and one miscarriage were reported.  *Id*. ¶ 3.4.  In Maryland, one of the affected consumers was Mr. Wells.  *Id*. ¶ 3.67.  On or about August 23, 2011, Mr. Wells began having symptoms of Listeriosis[7] after consuming *Listeria*-contaminated cantaloupe sold by Frontera. *Id*. ¶¶ 3.67-3.68.  One week later--on August 31, 2011--Mr. Wells died.  *Id*. ¶ 3.72.  Blood tests confirmed that Mr. Wells had been infected with one of the *Listeria monocytogenes* strains associated with the Jensen Farms outbreak.  *Id*. ¶ 3.73.

  1.  Jensen Farms, Frontera, and Primus

Jensen Farms, a Colorado Partnership, grew, processed, and packaged agricultural products, including cantaloupe.  ECF No. 14-1 ¶ 2.  Frontera distributed and sold cantaloupe in Maryland. ECF No. 38-1 ¶ 1.2.  In 2011, Frontera distributed almost all of Jensen Farms's cantaloupe crop.  *Id*. ¶ 3.9.  Before distribution, Frontera required Jensen Farms to pass a third-

---

[6] "United States Centers for Disease Control and Prevention."

[7] Listeriosis is a serious illness caused by eating food contaminated with *Listeria monocytogenes*.  ECF No. 38-1 ¶ 3.64. *Listeria* is found in soil and water.  *Id*.  Mr. Wells's symptoms included weight gain because of accumulated fluids in his body and shortness of breath. *Id*. ¶ 3.68.  Soon after, Mr. Wells lost his appetite and became extremely fevered.  *Id*. ¶¶ 3.70-3.71.

party food safety audit. *Id.* Primus provides audits for agricultural businesses that manufacture and sell food products. *Id.* ¶ 1.3.[8] Primus retained the services of a subcontractor, Bio Food Safety, to audit Jensen Farms's ranchlands and packing facility. *Id.* ¶¶ 1.3, 3.36.[9]

  2.   Pepper Equipment[10]

Pepper Equipment sold Jensen Farms the machinery Jensen Farms used to process cantaloupe. ECF No. 14-1 ¶ 4. Incorporated in Colorado, Pepper Equipment has its principal place of business in Monte Vista, Colorado. ECF No. 35-2 ¶ 2. Pepper Equipment manufactures and sells agricultural equipment in Colorado. *Id.* ¶ 3. It maintains a passive website,

---

[8] Primus is the nation's largest third-party food safety auditing firm. ECF No. 38-1 ¶ 3.11.

[9] Lloyd alleges, without supporting facts, that "Primus negligently failed to ensure that [Bio Food Safety], at the time of the Jensen Farms's 2011 audit, met [Primus's] necessary criteria, standards, and requirements," and that "Primus negligently failed to ensure that [Bio Food Safety's]" auditing standards matched those of Primus. *Id.* ¶¶ 3.50-3.51.

[10] Pepper Equipment submitted two affidavits about its contacts with Maryland. See ECF Nos. 35-2, 39-1. The second affidavit was submitted in response to Frontera's request for jurisdictional discovery, wherein Frontera sought information about Pepper Equipment's relationship to Maryland, including (1) whether Pepper Equipment ever sold its equipment, directly or through an agent, into Maryland; (2) the amount and frequency of Pepper Equipment's sales of equipment to growers or producers serving consumers nationwide; (3) Pepper Equipment's knowledge of the geographical extent of its customers, including Jensen Farms's, produce operation; and (4) whether Pepper Equipment directed advertising at Maryland. *See* ECF No. 36 at 12-13.

www.pepperequipmentco.com.   ECF Nos. 35-1 at 4, 35-3.[11]

Customers can view equipment, read about the company, and find

contact information.  *See* Pepper Equipment Corp.,

http://www.pepperequipmentco.com (accessed Sept. 16, 2014); ECF

No. 35-3.  The website states that Pepper Equipment "serve[s]

the produce industry throughout the U.S."  ECF No. 35-3 at 3.

According to Pepper Equipment's affidavits, all business

transactions between Jensen Farms and Pepper Equipment were in

Colorado, including Jensen Farms's purchase of cantaloupe

processing equipment.  ECF No. 35-2 ¶ 4.  Pepper Equipment has

not sold any of its agricultural equipment to purchasers in

Maryland or through distributors in Maryland.  ECF No. 39-1

¶¶ 6-7.  Pepper Equipment has never directed advertising to, or

advertised in, Maryland.  *Id.* ¶ 8.  Pepper Equipment has no

knowledge of the geographic distribution of its customers'

products, including Jensen Farms.  *Id.* ¶¶ 9-10.

3.   Jensen Farms Audit

Before the *Listeria* outbreak discussed below,[12] in 2011

Jensen Farms or Frontera, or both, contracted with Primus to

---

[11] Pepper Equipment's website is "passive" because it merely
"provide[s] information to those who are interested in procuring
its services."  ECF No. 35-1 at 4.  Interested purchasers,
including those from Maryland, must contact Pepper Equipment in
Colorado to obtain information, establish an account, or buy
equipment.  *Id.* at 14.

[12] *See* Section I.A.4.

audit Jensen Farms.  *Id.* ¶ 3.7.[13]  The contracting parties intended that Primus's audit (1) would "ensure that the facilities, premises, and procedures used by Jensen Farms in the production of cantaloupe met or exceeded the applicable standards of care related to the production of cantaloupe";[14] (2) would ensure that the food products Jensen Farms produced and Frontera distributed would be high quality, fit for human consumption, and not contaminated by lethal pathogens, such as *Listeria*; and (3) would determine whether the conditions under which Jensen Farms produced its cantaloupes met the standards of care necessary to be "Primus Certified." *Id.* ¶ 3.17.  Frontera required Jensen Farms cantaloupe to be Primus Certified before it sold or distributed the cantaloupe, a requirement of which Primus was aware.  Id. ¶¶ 3.18, 3.26.[15]

---

[13] Primus held itself out as an expert in food safety, including in the analysis and assessment of food safety procedures, facility design and maintenance, and best practices and standards of care applicable to agricultural producers.  ECF No. 38-1 ¶ 3.14.  Primus's website states that it is a "global leader in food safety" and "When food safety counts, look to Primus Labs."  *Id.* ¶ 3.15.

[14] Those standards included "good agricultural and manufacturing practices, industry standards, relevant FDA industry guidance, and Primus's own audit standards and guidelines."  *Id.* 3.17.

[15] Frontera expected the Primus certification to induce consumers to buy its cantaloupe and intended that consumers would benefit from Primus's audit and certification.  *Id.* ¶ 3.19.  However, Lloyd alleges Frontera knew that the food safety audits provided by Primus and Bio Food Safety were inadequate to assure

In the contract, Primus agreed, pursuant to its audit guidelines:

- [T]o assess and determine if Jensen Farms's packinghouse facilities, premises, and food safety procedures met or exceeded the applicable good agricultural and manufacturing practices, industry standards, and relevant FDA industry guidance standards of care;
- [T]hat its auditors should interpret its audit guidelines with food safety and risk minimization being the key concerns;
- [T]hat its auditors should consider that where laws, commodity specific guidelines, and/or best practices recommendations existed and were derived from a reputable source, those practices and parameters should be followed; [and]
- [T]hat the Jensen Farms . . . auditor [would] utilize four separate conformance categories, with related relative scoring levels and points: full conformance; minor deficiency; major deficiency; and non-conformance.

*Id.* ¶¶ 3.27-3.30.

Primus's audit guidelines included a "Good Manufacturing Practices (The Facility Tour)" section that assessed "general food safety, operational practices, equipment, equipment cleaning, and general cleaning practices and procedures."  *Id.* ¶ 3.31.  The guidelines also included a "Food Safety File" section that assessed "general food safety file requirements, self-inspection records, maintenance and sanitation records, and

---

auditees' compliance with standards for fresh produce, and were designed, in part, to ensure that auditees passed the audit. *Id.* ¶ 3.10.  In 2008, 98.1% of Primus's audits resulted in a passing score; in 2009, that figure dropped slightly to 97.5%; in 2010, it rose to 98.7%.  *Id.* ¶ 3.11.

microbial testing records." *Id.* ¶ 3.32.   Both sections were to
be assigned a conformance category. *Id.* ¶¶ 3.31-3.32.[16]

On July 25, 2011, Bio Food Safety auditor James DiIorio[17]
audited Jensen Farms's ranchlands and packing facility (the
"2011 audit"). *Id.* ¶ 3.36.   Although Primus's guidelines
required Jensen Farms to be engaged in normal functions during
the audit, or the audit would be terminated, Jensen Farms was
not operational when DiIorio conducted his audit. *Id.* ¶¶ 3.35-
3.36.   DiIorio gave Jensen Farms a "superior" rating, and a
score of 96%. *Id.*

During the 2011 audit, Eric Jensen explained to DiIorio the
refurbished washing system that had replaced a hydrocooler
previously used to wash cantaloupe, including the
discontinuation of the use of chlorinated water. *Id.* ¶ 3.37.[18]

---

[16] The contract assigned Primus the "unilateral capability" to
determine whether Jensen Foods's facility met food safety
requirements, and if not, to "automatically fail the facility's
audit." *Id.* ¶ 3.33.

[17] There has been inconsistent spelling of DiIorio.   The Court
uses Primus's spelling. *See* ECF No. 19-1.

[18] In August 2010, Bio Food Safety president Jerry Walzel audited
Jensen Farms for Primus. *Id.* ¶ 3.23.   Then, Jensen Farms had
added chlorine to the hydrocooler water used to wash cantaloupe.
*Id.*   After the August 2010 audit, Jensen Farms asked Walzel for
advice on improving its cantaloupe production processes. *Id.*
¶ 3.24.   Walzel recommended replacing the hydrocooler and, based
in part on that advice, Jensen Farms replaced the hydrocooler
with refurbished equipment previously used to process potatoes.
*Id.*   The replacement system did not use chlorinated water to
wash the cantaloupe. *Id.* ¶ 3.25.

DiIorio saw the washing system and noted the change in his report. *Id*. He did not question the removal of the hydrocooler or the suitability of the replacement washing system; he did not advise Jensen Farms that the replacement system was deficient, below industry standards and practice, or that it created a contamination risk. *Id*.

DiIorio failed to consider "multiple conditions or practices," including the use of inappropriate equipment, the lack of antimicrobial solution in the cantaloupe wash water, the absence of hot water for hand-washing, the failure to precool cantaloupe, and poor facility design that enabled pooled water to create a harborage site for bacteria. *Id*. ¶¶ 3.46-3.46.7. Had DiIorio terminated the audit or considered deficient facility conditions and practices, Jensen Farms would not have passed the 2011 audit. *Id*. ¶¶ 3.52-3.53. DiIorio "erroneously misrepresented to Jensen Farms" that it "met or exceeded" applicable standards of care, thereby preventing Jensen Farms from taking corrective action. *Id*. ¶¶ 3.58, 3.62.

4.   *Listeria* Outbreak

On September 2, 2011, the Colorado Department of Public Health and the Environment ("CDPHE") announced that it was investigating an outbreak of Listeriosis. *Id*. ¶ 3.1. On September 9, 2011, CDPHE announced that the likely source of the *Listeria* outbreak was cantaloupe. *Id*. On September 12, 2011,

9

CDPHE announced that the *Listeria* was linked to Rocky Ford brand cantaloupe from Colorado; it later determined that the contaminated cantaloupes were grown by Jensen Farms and distributed by Frontera. *Id.*

On September 14, 2011, Jensen Farms recalled its Rocky Ford brand cantaloupe. *Id.* ¶ 3.6. On or about September 19, 2011, the Food and Drug Administration ("FDA") announced that it found *Listeria monocytogenes* on samples of Jensen Farms cantaloupe taken from a Denver-area store and on samples taken from equipment and cantaloupe at the Jensen Farms packing facility. *Id.* ¶ 3.5.

5. FDA and CDPHE Inspection of Jensen Farms

On September 10, 2011, FDA and CDPHE officials conducted an inspection at Jensen Farms. *Id.* ¶ 3.38. Of 39 samples collected from the facility, 13 tested positive for *Listeria monocytogenes* indistinguishable from three out of five outbreak strains. *Id.* ¶ 3.39.[19] Testing showed that 17 out of 18 Jensen Farms cantaloupe removed from store shelves were positive for one or more of the five outbreak strains. *Id.* The higher rate of positive samples taken from store shelves indicated that the

---

[19] Cantaloupe collected from Jensen Farms's cold storage also tested positive for two of the five outbreak strains. *Id.* ¶ 3.39.

conditions under which the cantaloupes were distributed allowed *Listeria monocytogenes* to thrive. *Id.*

From September 22-23, 2011, the FDA conducted an environmental assessment at Jensen Farms. *Id.* ¶¶ 3.41-3.42. The FDA reported its findings in an October 19, 2011 report ("FDA Report").

On facility design, the FDA Report stated that certain features of the packing facility allowed water to pool on the packing facility floor. *Id.* ¶ 3.42(a). Wet environments are potential reservoirs for *Listeria monocytogenes*, and the pooling of water near packing equipment may have spread the pathogen to food contact surfaces. *Id.* Samples collected from areas where water had pooled tested positive for outbreak strains. *Id.* Thus, facility design "may have contributed to the introduction, growth, or spread of *Listeria monocytogenes*." *Id.*[20]

On equipment design, the FDA Report stated that the equipment used to wash and dry the cantaloupe was not easily cleaned or sanitized. *Id.* ¶ 3.42(b). Dirt and product buildup was visible on the equipment, even after it had been disassembled, cleaned, and sanitized. *Id.* The FDA Report stated that, because the equipment was not easily cleaned and

---

[20] The FDA Report further stated that the "packing facility floor was constructed in a manner that was not easily clean[ed]," and may have provided a harborage site for *Listeria monocytogenes*. *Id.* ¶ 3.42(a).

had previously been used to process other raw produce "with different washing and drying requirements, *Listeria monocytogenes* could have been introduced" from the equipment's prior use. *Id.* Thus, equipment design "likely contributed to the introduction, growth, or spread of *Listeria monocytogenes*" found on the cantaloupe. *Id.*

On postharvest practices, the FDA Report stated that "[w]arm fruit with field heat potentially created conditions" allowing "the formation of condensation," which was ideal for *Listeria monocytogenes* growth. *Id.* Samples collected from cold storage tested positive for two outbreak strains. *Id.* The FDA Report concluded that the absence of precooling before the cantaloupes entered cold storage "may have provided ideal conditions for *Listeria monocytogenes*" to develop. *Id.*

In October and December 2011, FDA officials participated in briefings pursuant to a congressional investigation into the causes of the *Listeria* outbreak. *Id.* ¶ 3.43. FDA officials cited failures at Jensen Farms that "reflected a general lack of awareness of food safety principles," including condensation on the packing facility floor; poor drainage resulting in water pooling; "inappropriate food processing equipment"; the lack of antimicrobial solution, such as chlorine, in the cantaloupe wash water; and the absence of equipment to remove heat from

12

cantaloupes before they entered cold storage.  *Id.* ¶¶ 3.43-
3.43.5.

In contrast, the 2011 audit found "many aspects of Jensen
Farms's facility, equipment and procedures the FDA heavily
criticized to be in 'total compliance.'"  *Id.* ¶ 3.44.  DiIorio
failed to "observe, properly down-score, or consider multiple
conditions or practices [that violated] Primus's audit
standards, industry standards, and applicable FDA industry
guidance."  *Id.* ¶ 3.45.  Had those conditions and practices been
considered, Jensen Farms would have failed its audit.  *Id.*
¶ 3.47.[21]

B.   Procedural History

On July 31, 2013, Lloyd sued Frontera and Primus alleging
strict liability, breach of warranty, and negligence.  ECF No.
1.  On November 5, 2013, Primus moved to dismiss for failure to
state a claim.  ECF No. 19.  On November 19, 2013, Lloyd opposed
Primus's motion.  ECF No. 30.  On November 20, 2013, Frontera
opposed Primus's motion.  ECF No. 31.  On December 3 and 4,
2013, Primus replied.  ECF Nos. 32, 33.  On January 30, 2014,

---

[21] According to James R. Gorny, Ph.D., FDA Senior Advisor for
Produce Safety, the Jensen Farms audit resulting in a "superior"
rating and 96% score "was seriously deficient in its inspection
and findings."  *Id.* ¶ 3.48.

Lloyd moved for leave to supplement her opposition to Primus's motion, ECF No. 37, and to amend her complaint, ECF No. 38.[22]

On November 12, 2013, Frontera asserted third-party claims against Jensen Farms, Bio Food Safety, and Pepper Equipment. ECF No. 26.  On January 6, 2014, Pepper Equipment moved to dismiss for lack of personal jurisdiction.  ECF No. 35.  On January 24, 2014, Frontera opposed the motion.  ECF No. 36.  On February 4, 2014, Pepper Equipment replied.  ECF No. 39.

## II.  Analysis

### A.   Legal Standards

#### 1.   Motion for Leave to Amend

Federal Rule of Civil Procedure 15(a)(2) instructs that leave to amend should be freely given when justice requires. Leave should be denied only when amendment would unduly prejudice the opposing party, amount to futility, or reward the movant's bad faith.[23]  *Steinburg v. Chesterfield Cnty. Planning Comm'n*, 527 F.3d 377, 390 (4th Cir. 2008); *Equal Rights Ctr. v. Niles Bolton Associates*, 602 F.3d 597, 603 (4th Cir. 2010).  An amendment is futile if it would fail to withstand a motion to

---

[22] Primus preemptively opposed Lloyd's motion to amend.  *See* ECF No. 19-1 at 21 ("Any attempt to amend would prove futile. . . ."); ECF No. 32 (requesting dismissal with prejudice and without leave to amend).

[23] Primus does not assert that Lloyd seeks leave to amend in bad faith or that the amendment would prejudice them, but that the amendment would be futile.  *See* ECF No. 19-1 at 21.

dismiss.  *See Perkins v. United States,* 55 F.3d 910, 917 (4th Cir. 1995).

2.   Motion to Dismiss for Failure to State a Claim

Under Federal Rule of Civil Procedure 12(b)(6), an action may be dismissed for failure to state a claim upon which relief can be granted.  Rule 12(b)(6) tests the legal sufficiency of a complaint, but does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Court bears in mind that Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001).  Although Rule 8's notice-pleading requirements are "not onerous," the plaintiff must allege facts that support each element of the claim advanced. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 764-65 (4th Cir. 2003).  These facts must be sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

This requires that the plaintiff do more than "plead[] facts that are 'merely consistent with a defendant's liability;'" the facts pled must "allow[] the court to draw the reasonable inference that the defendant is liable for the

15

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 557).  The complaint must not only allege but also "show" that the plaintiff is entitled to relief.  *Id.* at 679 (internal quotation marks omitted). "Whe[n] the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not shown--that the pleader is entitled to relief."  *Id.* (internal quotation marks and alteration omitted).

### 3.   Motion to Dismiss for Lack of Personal Jurisdiction

Under Federal Rule of Civil Procedure 12(b)(2), the Court may dismiss a complaint unless the plaintiffs can prove personal jurisdiction by a preponderance of the evidence.[24]  If the court determines the issue of personal jurisdiction without an evidentiary hearing, and relies only on the complaint, affidavits, and discovery materials, "the plaintiff need only make a prima facie showing of personal jurisdiction." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390,

---

[24] *Mylan Labs, Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993); Fed. R. Civ. P. 12(b)(2).  Personal jurisdiction may be general or specific.  General jurisdiction requires the defendant's "continuous and systematic" contacts with the forum state.  *Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 450 (4th Cir. 2000).  Specific jurisdiction requires that the defendant's "contacts relate to the cause of action and create a substantial connection with the forum state." *Id.*  Frontera does not argue that the Court has general jurisdiction over Pepper Equipment.  *See* ECF No. 36 at 4.

396 (4th Cir.2003).  In determining whether the prima facie

showing has been made, the court "must draw all reasonable

inferences arising from the proof, and resolve all factual

disputes, in the plaintiff's favor." *Mylan Labs., Inc. v. Akzo,*

*N.V.*, 2 F.3d 56, 60 (4th Cir. 1993).  However, the Court need

not "credit conclusory allegations or draw farfetched

inferences."[25]

B.   Primus's Motion

Primus asserts that Lloyd has failed to allege sufficient

facts to support a negligence claim. *See* ECF No. 19-1 at 7.  To

establish negligence under Maryland law,[26] a plaintiff must

prove: 1) the defendant was under a duty to protect the

plaintiff from injury; 2) the defendant breached that duty; (3)

the plaintiff suffered actual injury or loss; and (4) the loss

or injury proximately resulted from the defendant's breach. *See*

*Valentine v. On Target, Inc.*, 727 A.2d 947, 949 (Md. 1999);

*Gourdine v. Crews*, 955 A.2d 769, 779 (Md. 2008) ("The negligence

---

[25] *Masselli & Lane, PC v. Miller & Schuh, PA*, No. 99-2440, 2000 WL 691100, *1 (4th Cir. May 30, 2000) (*citing Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 203 (1st Cir. 1994)).

[26] Maryland applies the rule of *lex loci delicti* to determine the law to apply in tort cases. *See, e.g., Philip Morris Inc. v. Angeletti*, 752 A.2d 200 (Md. 2000). Under that rule, the court applies the law of the state "where the injury-the last event required to constitute the tort-occurred." *Lab. Corp. of America v. Hood*, 911 A.2d 841 (Md. 2006). Here, Mr. Wells's *Listeria* illness and death occurred in Maryland. *See* ECF No. 38-1 ¶¶ 3.67-3.72.

count of a products liability claim comports with longstanding common law tort principles.") (*quoting Nissen Corp. v. Miller*, 594 A.2d 564, 567 (1991)).

"Generally, whether there is adequate proof of the required elements needed to succeed in a negligence action is a question of fact to be determined by the fact finder; but, the existence of a legal duty is a question of law to be decided by the court." *Valentine*, 727 A.2d at 949. "Maryland has gone about as far as any state in holding that meager evidence of negligence is sufficient to carry a case to the jury." *Moo die v. Santoni*, 441 A.2d 323, 326 (1982) (*citing Fowler v. Smith*, 213 A.2d 549 (1965)).

### 1. Duty

In the absence of a duty of care, there can be no liability in negligence. *Walpert, Smullian & Blumenthal, P.A. v. Katz, et al.*, 762 A.2d 582 (Md. 2000). To determine whether a duty of care exists, the court considers "the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties." *Jacques v. First Nat. Bank of Maryland*, 515 A.2d 756, 759 (Md. 1986). "Such a relationship may be established in a number of ways: (1) by statute or rule; (2) by contractual or other private relationship; or (3) indirectly or impliedly by virtue of the relationship between the tortfeasor and a third party." *Bobo v.*

*State*, 697 A.2d 1371, 1376 (Md. 1997) (internal citations omitted).  Lloyd argues four different theories for finding that Primus owed Mr. Wells a duty of reasonable care.  *See* ECF No. 30 at 12-17.  Each will be discussed in turn.

        i.     Foreseeable Risk

Primus asserts that neither the *Listeria* outbreak, nor Mr. Wells's illness and death, were foreseeable results of the 2011 audit.  ECF No. 19-1 at 13.  Primus further asserts that even if the audit created a risk of harm, not "every member of the general public was within the zone of foreseeable risk."  *Id*. Lloyd asserts that Primus's audit created a foreseeable risk of harm to consumers of Jensen Farms cantaloupe.  ECF No. 30 at 10, 12.

When "the failure to exercise due care creates risks of personal injury, the principal determinant of duty becomes foreseeability."  *Vill. of Cross Keys, Inc. v. U.S. Gypsum Co.*, 556 A.2d 1126, 1131 (Md. 1989) (*quoting Jacques*, 515 A.2d at 760) (internal quotation marks omitted).[27]  Duty, however,

---

[27] *See also Heavenly Days Crematorium, LLC v. Harris, Smariga & Associates, Inc.*, 72 A.3d 199, 200 (2013) ("Each of us has a duty to act with reasonable care to avoid acts or omissions that one may reasonably foresee will injure another.").  Additional policy considerations include:

> [T]he degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached  to the defendant's conduct, the

"requires a close or direct effect of the tortfeasor's conduct on the injured party." *Gourdine*, 955 A.2d at 784-85 ("This Court has resisted the establishment of duties of care to indeterminate classes of people.").[28]

Here, Lloyd alleges that Primus conducted the 2011 audit to ensure that Jensen Farms's cantaloupe was safe for human consumption and free of dangerous contaminants, and that Jensen Farms's facilities and procedures met applicable standards of care. ECF No. 38-1 ¶ 3.17. It follows that a poorly conducted

---

policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*Ashburn v. Anne Arundel County*, 510 A.2d 1078, 1083 (1986) (citation omitted).

[28] The Maryland Court of Appeals explained:

The rule that you are to love your neighbor becomes in law, you must not injure your neighbor, and the lawyer's question, Who is my neighbor? receives a restricted reply. You must take reasonable care to avoid acts or omissions which you can reasonably foresee would be likely to injure your neighbor. Who, then, in law is my neighbor? The answer seems to be persons who are so closely and directly affected by my act that I ought reasonably to have them in contemplation as being so affected when I am directing my mind to the acts or omissions which are called in question.

*Heavenly Days Crematorium, LLC*, 72 A.3d at 200, n.1 (*quoting Gourdine*, 955 A.2d at 784).

audit could foreseeably produce the opposite result: unsafe and contaminated cantaloupe being made available to consumers.  This is what Lloyd alleges.  DiIorio gave Jensen Farms a "superior rating" when, shortly thereafter, Jensen Farms was forced to recall its cantaloupe and FDA officials described "a general lack of awareness of food safety principles" at Jensen Farms. *Id.* ¶¶ 3.6, 3.36, 3.43.  That Primus did not foresee the *Listeria* outbreak does not change the outcome.  *See Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 266 (Md. 2007) ("[P]laintiff must allege facts that demonstrate that the product at issue creates a *dangerous condition*, one that gives rise to a *clear danger of death or personal injury*) (citation omitted).

Lloyd also alleges sufficient facts showing a "close or direct effect" between the audit and Mr. Wells's illness and death.  *See Gourdine*, 955 A.2d at 784-85.  Primus knew that Frontera required Primus certification to distribute the cantaloupe, and, following the audit, Jensen Farms cantaloupe was "Primus Certified".  ECF No. 38-1 ¶¶ 3.26, 3.54.  Had DiIorio properly conducted the audit and failed Jensen Farms, Lloyd alleges, Frontera would not have distributed its cantaloupe, and Mr. Wells would not have been infected with *Listeria monocytogenes*.  *Id.* ¶¶ 3.53-3.56.  Recognizing a duty of care in this context does not, as Primus argues, create a duty to every member of the general public.  ECF No. 19-1 at 13.

It merely recognizes that when Primus agreed to conduct an audit intended, in part, to ensure that Jensen Farms cantaloupe was safe for human consumption, it "ought reasonably to have [consumers of Jensen Farms cantaloupe] in contemplation" when it conducted the audit. *Heavenly Days Crematorium, LLC*, 72 A.3d at 200, n.1. Primus owed them a duty.

As a policy matter, nonnegligent audits of agricultural facilities producing food for consumers should be encouraged. *See Valentine*, 727 A.2d at 950 (considering policy reasons for a duty is important "to discourage or encourage specific types of behavior by one party to the benefit of another party"). Here, 147 people contracted Listeriosis from the Jensen Farms outbreak; of those, 33 people died and one miscarriage was reported. ECF No. 38-1 ¶¶ 3.2, 3.4. When, as here, allegations of negligence are directed at the nation's largest third-party food safety auditing firm, *id*. ¶ 3.11, public policy favors the finding of a duty of care.[29] Accordingly, the Court finds that

---

[29] *Cf. Rosenblatt v. Exxon Co.*, U.S.A., 642 A.2d 180, 189 (Md. 1994) ("The imposition of a duty upon one to another serves to balance the burdens between the parties in avoiding the harm."). *Rosenblatt* declined to impose a duty on a lessor when the lessee had adequate information and means to avoid the alleged harm: "When Rosenblatt entered into the lease, he was aware that the property had been used for a gas station. . . . He could have required that the property be tested for contamination; he could have negotiated express warranties in the lease." *Id*.

Here, there is no indication that Mr. Wells was on notice of potential *Listeria*-contamination or could have detected the

Primus owed Mr. Wells a duty of care under general negligence principles.

> ii.      Restatement (Second) of Torts § 324A

Primus asserts that in conducting the audit it did not undertake to protect third parties or assume a duty for Jensen Farms.  ECF No. 32 at 6.[30]  Lloyd asserts that Primus conducted the audit to ensure that cantaloupes were safe for third parties: consumers of cantaloupe.  ECF No. 30 at 15.

The Restatement (Second) of Torts § 324A states the "Good Samaritan" doctrine recognized under Maryland tort law.  *See In re Sabin Oral Polio Vaccine Products Liab. Litig.*, 774 F. Supp. 952, 954 (D. Md. 1991) *aff'd*, 984 F.2d 124 (4th Cir. 1993). Section 324A provides:

---

pathogen by inspecting the cantaloupe.  Additional policy considerations cited in *Ashburn*, 510 A.2d at 1083, support finding a duty.  *See supra* note 27.  Preventing outbreaks of food contamination is a worthy goal.  Imposing a duty will not unduly burden Primus; it merely requires that Primus conduct its audits with necessary care.  The community--here, nationwide food consumers--will benefit from having Primus better ensure that food producers comply with industry standards and produce food safe for human consumption.

[30] Primus argues that, under *Patton v. United States of Am. Rugby Football*, 851 A.2d 566, 571-72 (Md. 2004), it lacked the necessary "special relationship" to owe Mr. Wells a duty of care.  *See* ECF No. 19-1 at 12-13.  However, *Patton* contemplates a "special duty" arising "by virtue of the relationship between the tortfeasor and a third party," 851 A.2d at 572 (*quoting Bobo*, 697 A.2d at 1376), and is therefore consistent with § 324A.

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
> (b) he has undertaken to perform a duty owed by the other to the third person, or
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts: Liability to Third Person for Negligent Performance of Undertaking § 324A (1965);[31] *see also Brady v. Ralph M. Parsons Co.*, 572 A.2d 1115, 1123 (Md. Ct. Spec. App. 1990) *aff'd,* 609 A.2d 297, 300 n.2 (Md. 1992) (Parsons Company potentially liable to injured worker's survivors for failing to ensure compliance with occupational safety regulations at a subway construction site under its contract with Maryland Mass Transit Authority ("MTA")).  In the context of rescue liability, the Fourth Circuit stated that § 324A "sets a high bar to impose liability," and that "[t]he test is whether the risk was increased over what it would have

---

[31] Section 324A requires a foreseeable third-party beneficiary, but not foreseeable harm. *See, e.g., Moyer Packing Co. v. United States*, 567 F. Supp. 2d 737, 755 (E.D. Pa. 2008).

24

been had the defendant not engaged in the undertaking at all."
*Turner v. United States*, 736 F.3d 274, 281 (4th Cir. 2013).[32]

Here, Lloyd alleges that Primus undertook the audit for
another--Frontera or Jensen Farms--because Frontera would not
distribute Jensen Farms cantaloupe unless it received the safety
assurances represented by Primus certification.  ECF No. 38-1
¶¶ 3.17-3.18.  Primus knew the purpose of the audit--to ensure
the distribution of high quality, pathogen-free cantaloupe--and
for whose benefit--consumers--it was done.  The faulty 2011
audit arguably increased the risk of harm to consumers because
it enabled Frontera to distribute *Listeria*-contaminated
cantaloupe.

Primus's contractual obligations were not unlike those
Parsons Company performed for MTA.  *See Brady*, 572 A.2d at 1123.
Parsons Company was responsible for ensuring that workplace
safety complied with OSHA[33] and MOSHA[34] regulations.  *Id.*  Here,
Lloyd alleges that Primus was contractually obliged to assess
Jensen Farms's compliance with "applicable good agricultural and
manufacturing practices, industry standards, and relevant FDA

---

[32] *See also Deines v. Vermeer Mfg. Co.*, 752 F. Supp. 989, 995 (D. Kan. 1990) ("It is well established that mere negligence in failing to discover a danger on the part of a defendant, even if proved, would not subject the defendant to liability under § 324A(a).").

[33] "Occupational Safety and Health Act of 1970."

[34] "Maryland Occupational Safety and Health Act."

industry guidance standards of care." ECF No. 38-1 ¶ 3.27.
Although noncompliant, Lloyd alleges that DiIorio misrepresented
to Jensen Farms that it complied with the applicable standards
of care by assigning Jensen Farms a "superior" rating. *Id.* ¶
3.58. Because the 2011 audit prevented Jensen Farms from taking
corrective action, *id.* ¶ 3.62, it "increased the risk of
. . . harm," § 324A(a).

The Restatement comments include the following analogous
illustration of § 324A(c):

> A Company employs B Company to inspect the elevator in
> its office building. B Company sends a workman, who
> makes a negligent inspection and reports that the
> elevator is in good condition. Due to defects in the
> elevator, which a proper inspection would have
> disclosed, the elevator falls and injures C, a workman
> employed by A Company. B Company is subject to
> liability to C.

Restatement (Second) of Torts § 324A cmt. e, illus. 4 (1965).

Here, Lloyd alleges that Frontera relied on Primus's audit
and certification to distribute contaminated Jensen Farms
cantaloupe, and that Frontera expected consumers to rely on the
Primus certification when buying cantaloupe. ECF No. 38-1
¶¶ 3.18-3.19. Had Primus assigned Jensen Farms a failing score,
Frontera would not have distributed the contaminated cantaloupe.
*Id.* ¶ 3.53-3.56.[35] Accordingly, Lloyd has alleged sufficient

---

[35] Although Lloyd has not alleged facts showing that third-party
consumers, including Mr. Wells, relied on Primus certification
when buying the contaminated cantaloupe, Lloyd alleges that

facts showing that Primus owed Mr. Wells a duty under § 324A(a) and (c).[36]

### iii.    Third-Party Beneficiary

Primus asserts there is no evidence that Mr. Wells was an intended beneficiary of the 2011 auditing contract.  ECF No. 32 at 5-6.  Lloyd asserts that the auditing contract was intended to benefit consumers of Jensen Farms cantaloupe, including Mr. Wells, and, thus, Primus owed those consumers a duty.  ECF No. 30 at 13-14.

A third party beneficiary is not a party to a contract, but may sue to enforce it. *Dickerson v. Longoria*, 995 A.2d 721, 741-42 (Md. 2010).  "It is not enough that the contract merely operates to an individual's benefit: An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee." *120 W. Fayette St., LLLP v. Mayor of Baltimore*, 43 A.3d 355, 368 (Md. 2012) (*quoting Lovell Land, Inc. v. State Highway Admin.*, 969 A.2d 284, 295 (2009)).  To qualify as a third party beneficiary, the individual must show

---

Frontera expected consumers to rely on the Primus certification. *Id.* ¶ 3.19.  However, for § 324A(c) to apply, it is sufficient that the "other"--here, Frontera--rely upon the undertaking; reliance by the third-party consumer is not required.

[36] Lloyd has not alleged facts showing that Primus undertook to perform the duty Frontera or Jensen Farms owed to consumers, such that Frontera or Jensen Farms was relieved of that duty. Thus, the Court does not find that Lloyd has alleged facts sufficient to state a claim under § 324A(b).

that the contract was "intended for his benefit" and "the parties intended to recognize him as the primary party in interest." *Dickerson*, 995 A.2d at 741 (internal quotation marks and alteration omitted); *Shillman v. Hobstetter*, 241 A.2d 570, 577 (Md. 1968) ("The face of the contract . . . indicates that the primary and direct benefit was intended for the contract purchasers.").

Here, though Lloyd alleges the contracting parties intended to benefit consumers by ensuring the safety of Jensen Farms cantaloupe, the contract terms, as alleged, do not show that consumers were the "primary party in interest." *See id*; ECF No. 38-1 ¶¶ 3.17, 3.27-3.30.  The alleged terms do not mention consumers, but state Primus's technical responsibilities pursuant to its audit guidelines.  *Id*.  Although the 2011 audit, as previously discussed, foreseeably affected consumers, it does not follow that the contracting parties expressly intended to benefit consumers.  Lloyd has not alleged sufficient facts showing that Mr. Wells was an intended third-party beneficiary of Primus's auditing contract.

iv.    Negligent Hiring and Supervision

Primus asserts there are no facts showing that it knew or had reason to know that Bio Food Safety or DiIorio would negligently conduct the audit.  ECF No. 19-1 at 11.  Lloyd asserts that DiIorio's "training deficiencies" possibly resulted

in the "poorly conducted audit," and, thus, that Primus negligently selected Bio Food Safety and DiIorio to conduct the audit and negligently monitored their performance.  ECF No. 30 at 17.

In Maryland, to prove negligent hiring or supervision a plaintiff must show that: (1) "[his] injury was caused by the tortious conduct of an employee;" (2) "the employer knew or should have known that the employee was capable of inflicting harm of some type," (3) "the employer failed to use proper care in hiring or training the employee," and (4) "the employer's breach was the proximate cause of the plaintiff's injury." *Williams v. Cloverland Farms Dairy, Inc.*, 78 F. Supp. 2d 479, 484 (D. Md. 1999) (applying Maryland law); *see also Latty v. St. Joseph's Soc. of Sacred Heart, Inc.*, 17 A.3d 155, 165 (2011).

Here, Lloyd alleges, in a conclusionary fashion, that "Primus negligently failed to ensure that [Bio Food Safety], [. . .] met [Primus's] necessary criteria, standards, and requirements," and that "Primus negligently failed to ensure that [Bio Food Safety's]" auditing standards matched those of Primus.  ECF No. 38-1 ¶¶ 3.50-3.51.  Thus, Lloyd has not alleged sufficient facts showing that Primus knew or should have known

that Bio Food Safety was incompetent to perform its contractual duties.[37]

### 2.   Breach

Primus asserts that there is no evidence that DiIorio's failure to detect the problems noted by the FDA breached an auditor's standard of care. ECF No. 19-1 at 15.   Lloyd asserts that Primus breached its duty to comply with "good agricultural and manufacturing practices, industry standards, and relevant FDA industry guidance."   ECF No. 30 at 18.

Whether there is sufficient proof of a breach of duty is generally "a question of fact to be decided by the fact-finder." *Valentine*, 727 A.2d at 949.   "Facts must be pleaded with some specificity to demonstrate that the elements which are required to sustain the cause of action exist. It is not sufficient to merely assert conclusory allegations suggesting that the elements are in fact present in the controversy."   *Id*.

Here, Lloyd alleges that DiIorio conducted the 2011 audit in violation of Primus's guidelines requiring Jensen Farms to be operating normally at the time of the audit.   ECF No. 38-1 ¶¶ 3.35-3.36.   Although Primus's audit guidelines required DiIorio to assess "Good Manufacturing Practices," Jensen Farms was not

---

[37] Lloyd alleges Frontera knew that the audits conducted by Primus and Bio Food Safety would be inadequate, but does not allege facts showing that Primus was aware of Bio Food Safety's deficiencies.   *See* ECF No. 38-1 ¶ 3.10.

advised that the machine used to wash the cantaloupe--without
chlorinated water--was deficient or created a contamination
risk.  *Id.* ¶¶ 3.31, 3.37.  DiIorio also failed to inform Jensen
Farms that its facility design potentially created a harborage
site for bacteria in places where water pooled.  *Id.* ¶ 3.46.  In
contrast to the multiple failures found soon after by the FDA,
Lloyd alleges that DiIorio found "many aspects of Jensen
Farms. . . to be in 'total compliance.'"  *Id.* ¶¶ 3.43-3.44.
Accordingly, Lloyd has alleged sufficient facts to present a
triable issue on whether Primus breached its duty of care.

       3.   Causation

Primus asserts there is no evidence that a failing audit
score would have prevented the distribution, sale, and
consumption of contaminated cantaloupe.  ECF No. 19-1 at 18.
Primus further asserts there is no evidence that the strain of
*Listeria* that Primus allegedly failed to detect was the same
strain later found at Jensen Farms. *Id.* at 20.  Lloyd asserts
that causation is met because a failing audit would have
prevented the distribution of contaminated cantaloupe.  ECF No.
30 at 19.[38]

To recover, the defendant's negligence must be a proximate
cause of the plaintiff's alleged harm. *See Pittway Corp. v.*

---

[38] Lloyd does not allege that Primus was negligent for failing to
detect *Listeria*.  ECF No. 30 at 22.

*Collins*, 973 A.2d 771, 786 (Md. 2009).  "To be a proximate cause for an injury, the negligence must be (1) a cause in fact, and (2) a legally cognizable cause." *Id.* (*quoting Hartford Ins. Co. v. Manor Inn,* 642 A.2d 219, 230 (Md. 1994) (internal quotation marks omitted)).  When only one negligent act is at issue, causation-in-fact exists if the injury would not have occurred "but for" the defendant's negligent act. *Wankel v. A & B Contractors, Inc.,* 732 A.2d 333, 349 (Md. Ct. Spec. App. 1999). If two or more independent acts result in the injury, causation-in-fact exists when "it is 'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Id*; *Eagle-Picher v. Balbos*, 604 A.2d 445, 459 (Md. 1992) (adopting the Restatement (Second) of Torts § 431 substantial factor test).[39]

In determining legal causation, the Court must consider "whether the actual harm to a litigant falls within a general field of danger that the actor should have anticipated or expected." *Pittway,* 973 A.2d at 787.  The question of legal

---

[39] Section 431 provides:

> The actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm.

Restatement (Second) of Torts: What Constitutes Legal Cause § 431 (1965).

causation is "grounded in foreseeability." *Troxel v. Iguana Cantina, LLC,* 29 A.3d 1038, 1055 (Md. Ct. Spec. App. 2011). The existence of proximate cause is typically a question reserved for the jury, unless "reasoning minds cannot differ." *Pittway,* 973 A.2d at 792 (*quoting Segerman v. Jonas,* 259 A.2d 794 (1969)); *Chang-Williams v. United States,* No. DKC-10-0783, 2013 WL 4454597, at *18 (D. Md. Aug. 15, 2013).  Because two or more independent acts resulted in Mr. Wells's illness and death,[40] the "substantial factor" test controls.  *See Balbos,* 604 A.2d at 459.

Here, Lloyd alleges that if DiIorio had terminated the audit or considered deficient facility conditions and practices, Jensen Farms would not have passed the 2011 audit or been "Primus Certified".  ECF No. 38-1 ¶¶ 3.52-3.55.  Then, Lloyd alleges, Frontera would not have made contaminated cantaloupe available for purchase, and Mr. Wells would not have contracted Listeriosis.  *Id.* ¶¶ 3.56, 3.67.  Accordingly, Lloyd has alleged sufficient facts showing "it is 'more likely than not'" that Primus's breach "was a substantial factor in producing [Mr. Wells's] injuries."  *Balbos,* 604 A.2d at 459.[41]

---

[40] *See* ECF No. 38-1 (asserting causes of action against Primus and Frontera for conduct leading to Mr. Wells's Listeriosis).

[41] Primus argues that "[t]he post-audit distribution, sale, and consumption of the cantaloupe by third parties outside Primus['s] control broke the 'natural and logical cause of the

Based on the foregoing, the Court finds that Lloyd's proposed amended complaint, ECF No. 38-1, sufficiently alleges negligence by Primus.  The Court will grant Lloyd's motion to amend her complaint and will deny as moot Primus's motion to dismiss.[42]

---

injury.'"  ECF No. 19-1 at 20 (*quoting Collins v. Li*, 933 A.2d 528, 573 (Md. Ct. Spec. App. 2007) *aff'd sub nom Pittway Corp.*, 973 A.2d 771.  *Collins*, however, sought to explain the difference between "active and passive negligence":

> The negligent acts must continue through every event and occurrence, and itself be the natural and logical cause of the injury. It must be the natural and probable consequence of the negligent act, unbroken by any intervening agency, and where the negligence of any one person is merely passive, and potential, while the negligence of another is the moving and effective cause of the injury, the latter is the proximate cause and fixes the liability.

*Collins*, 933 A.2d at 573 (*quoting Bloom v. Good Humor Ice Cream Co. of Baltimore*, 18 A.2d 592,593-94 (Md. 1941)).  Subsequent decisions "emphasized that the intervening negligence is not a superseding cause if it is reasonably foreseeable." *Id*. at 574 (internal quotation marks and citation omitted).  Here, Primus's alleged negligence was arguably active; moreover, Frontera's reliance on the audit, and the subsequent distribution, sale, and consumption of Jensen Farms cantaloupe, were foreseeable. Thus, at least at the motion to dismiss stage, there is a triable issue on whether Primus's conduct was a substantial factor in Mr. Wells's death.

[42] "It is well settled that an amended pleading supersedes the original pleading, and that motions directed at superseded pleadings are to be denied as moot." *Blount v. Carlson Hotels*, 3:11CV452-MOC-DSC, 2011 WL 6098697, at *1 (W.D.N.C. Dec. 6, 2011) (*citing Young v. City of Mount Ranier*, 238 F.3d 567, 573 (4th Cir. 2001) ("The general rule . . . is that an amended pleading supersedes the original pleading, rendering the original pleading of no effect.")).

C.    Pepper Equipment's Motion

Pepper Equipment asserts that its contacts are insufficient for personal jurisdiction under Maryland's long-arm statute, and do not satisfy due process. ECF No. 35-1 at 6, 14.   Frontera asserts that Pepper Equipment knew, or should have known, that its equipment would be used to clean and pack cantaloupes for Jensen Farms's consumers nationwide, including in Maryland.   ECF Nos. 36 at 3, 14-1 ¶ 4.   In conjunction with Pepper Equipment's website, and because Pepper Equipment "sells products designed only to process produce on a national level," Frontera asserts there is specific personal jurisdiction.   ECF No. 36 at 9.

A federal district court may assert specific personal jurisdiction over a non-resident when the exercise of jurisdiction is (1) authorized by the forum state's long-arm statute, and (2) consistent with due process.[43]   *Carefirst of Md., Inc.*, 334 F.3d at 396.   Maryland has construed the state's long-arm statute as coextensive with the scope of jurisdiction allowable by due process. *See Mackey v. Compass Mktg., Inc.*, 892

---

[43] In Maryland, the "statutory inquiry merges with [the] constitutional inquiry," because "Maryland courts have consistently held that the state's long-arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Constitution." *Carefirst of Md., Inc.*, 334 F.3d at 396-97.   A plaintiff must still specify which provisions of the long-arm statute provide for personal jurisdiction over the defendant. *See Cleaning Auth., Inc. v. Neubert*, 739 F. Supp. 2d 807, 811-12 & n.7 (D. Md. 2010); *Mackey, Inc.*, 892 A.2d at 493 n.6.

A.2d 479, 486 (Md. 2006). "Although the statutory and
constitutional inquiries merge, the Court must address both
elements in the personal jurisdiction analysis." *Metropolitan
Reg'l Info. Sys., Inc. v. American Home Realty Network, Inc.*,
888 F.Supp.2d 691, 698 (D. Md. 2012).

### 1.   Statutory Authority

Maryland's long-arm statute limits jurisdiction to claims
"arising from any act enumerated [in the statute]."  Md. Code,
Cts. & Jud. Proc. § 6-103(a).  Under subsection (b)(4), a
defendant who "causes tortious injury in [Maryland] . . . by an
act or omission outside [Maryland]" is subject to jurisdiction
here if the defendant "derives substantial revenue from goods,
food, services, or manufactured products used or consumed in
[Maryland]."  *Id.* § 6-103(b)(4).

### 2.   Due Process

Due process requires that the defendant have "minimum
contacts" with the State such that maintaining the suit "does
not offend 'traditional notions of fair play and substantial
justice.'"[44]  In determining whether the exercise of specific
personal jurisdiction comports with due process, a court
traditionally considers, *inter alia*, "the extent to which the
defendant has purposefully availed itself of the privilege of

---

[44] *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92
(1980) (*quoting Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316
(1945)).

conducting activities in the state." *Carefirst of Md., Inc.*, 334 F.3d at 397.

Under the "effects" test, a court may also assert jurisdiction over a non-resident defendant who has "expressly aimed" his tortious conduct at the forum state, knowing that the injury would be felt there. *Calder v. Jones*, 465 U.S. 783, 789 (1984). However, "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 296 (1980).

Interpreting *Calder*'s "effects" test narrowly,[45] the Fourth Circuit has held that the propriety of jurisdiction over an out-of-state defendant depends on "the defendant's own contacts with the state," not where the plaintiff feels the alleged injury. *ESAB Grp., Inc.* v. Centricut, Inc., 126 F.3d 617, 626 (4th Cir. 1997) (*citing Calder*, 465 U.S. at 789).

### 3.   Internet Presence

In the Internet context, Maryland may only "exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in

---

[45] *See Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002); *ESAB Grp.*, 126 F.3d at 626.

a person within the State, a potential cause of action cognizable in the State's courts." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002) (*citing Calder*, 465 U.S. at 789-90). "[A] person who simply places information on the Internet does not subject himself to jurisdiction in each State in which the electronic signal is transmitted and received."[46] When the Internet activity involves posting information on a website, the question is whether the defendant "manifested an intent to direct [his] website content . . . [to the forum state's] audience."[47]

> 4. Personal Jurisdiction over Pepper Equipment under § 6-103(b)(4)

Assuming that Pepper Equipment caused tortious injury in Maryland (Mr. Wells's illness and death) by an act or omission outside Maryland (its sale of equipment to Jensen Farms in Colorado), Frontera has not shown that Pepper Equipment derives substantial revenue from equipment or agricultural produce sold

---

[46] *ALS Scan, Inc.*, 293 F.3d at 714 (Georgia internet service provider was not subject to personal jurisdiction in Maryland when it provided bandwidth to Georgia company to create a website and send information over the internet but did not "select or knowingly transmit infringing photographs to Maryland with the intent of engaging in business or any other transaction in Maryland").

[47] *Young*, 315 F.3d at 263 (Connecticut newspapers were not subject to jurisdiction in Virginia court when they wrote articles about a Virginia prison but did not target a Virginia audience).

or consumed in Maryland.  Pepper Equipment obtains revenue from
its sales of equipment in Colorado.  *See* ECF Nos. 35-2 ¶ 4, 39-1
¶¶ 6-7.  That other companies use Pepper Equipment's products to
process agricultural produce, like cantaloupe, which those
companies then sell to nationwide distributors, including in
Maryland, without more, does not support the exercise of
personal jurisdiction under (b)(4).[48]

Even if the requirements of § 6-103(b)(4) were met, the
exercise of personal jurisdiction over Pepper Equipment would
violate due process.  Pepper Equipment conducts its business in
Colorado; it has not sold its equipment to buyers in Maryland
nor has it utilized a Maryland distributor.  ECF No. 39-1 ¶ 6-7.
Pepper Equipment is not aware of the geographic distribution of
its customer's products, *id.* ¶ 9-10, and, thus, has not aimed
tortious conduct at Maryland knowing injury would be felt there,
*Calder*, 465 U.S. at 789.

Pepper Equipment's website does not change the outcome.
That Pepper Equipment "place[d] information on the Internet"
without "direct[ing] electronic activity into [Maryland], . . .
with the manifested intent of engaging in business" in Maryland,

---

[48] Frontera's assertion that, "Pepper Equipment's equipment would
not have a market, *but for* commercial growers, like Jensen
Farms," does not save Frontera from the statutory requirement of
showing that Pepper Equipment derives substantial revenue from
Maryland.

does not establish personal jurisdiction over Pepper Equipment.
*ALS Scan, Inc.*, 293 F.3d at 714.  Though it was perhaps
foreseeable that its equipment would be used to process produce
eventually sold in Maryland, as suggested by Pepper Equipment's
online statement that it "serve[s] the produce industry
throughout the U.S.," ECF No. 35-3 at 3, the U.S. Supreme Court
has "clearly reject[ed] foreseeability as the standard for
personal jurisdiction," *Windsor v. Spinner Indus. Co.*, 825 F.
Supp. 2d 632, 638 (D. Md. 2011) (*citing J. McIntyre Mach., Ltd.*
*v. Nicastro*, 131 S. Ct. 2780, 2783 (2011)).

From the above, Frontera has not proven a *prima facie* case
for personal jurisdiction over Pepper Equipment.  *See Windsor*,
825 F. Supp. 2d at 639 (declining to exercise personal
jurisdiction over Taiwanese bicycle manufacturer).

5.   Frontera's Request for Discovery

Frontera requests jurisdictional discovery into Pepper
Equipment's relationship to Maryland.  ECF No. 36 at 12.[49]
"[W]hether or not to permit jurisdictional discovery is a matter
committed to the sound discretion of the district court." *Base
Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory,"*
283 F.3d 208, 216 n.3 (4th Cir. 2002).  Discovery is
inappropriate when "the pleadings contain[] no specific facts

---

[49] Pepper Equipment has opposed the request.  *See* ECF No. 39 at
13-15.

that could establish" the requisite contacts with Maryland.
*Mylan Labs, Inc.*, 2 F.3d at 64.[50]   Here, Frontera has failed to
provide any indication that personal jurisdiction over Pepper
Equipment is proper.[51]   Accordingly, jurisdictional discovery is
not appropriate.   The Court will grant Pepper Equipment's motion
to dismiss.

---

[50] *See also Carefirst of Md, Inc.*, 334 F.3d at 402 ("When a
plaintiff offers only speculation or conclusory assertions about
contacts with a forum state, a court is within its discretion in
denying jurisdictional discovery."); *Haley Paint Co. v. E.I.
DuPont De Nemours & Co.*, 775 F. Supp. 2d 790, 799-800 (D. Md.
2011 ("jurisdictional discovery cannot simply be a fishing
expedition")).

[51] Pepper Equipment's second affidavit of its contacts with
Maryland (or lack thereof), ECF No. 39-1, largely responds to
the types of information Frontera stated it would seek through
jurisdictional discovery, ECF No. 36 at 12-13.   *See Fleetwood v.
B.C.E., Inc.*, No. DKC 2003-2125, 2004 WL 903754, at *6 (D. Md.
Apr. 28, 2004) (unpublished) (jurisdictional discovery not
warranted when defendant's affidavits address jurisdictional
issues and plaintiff has not provided anything other than
"speculation and conclusory allegations" to refute the
affidavits).

III. Conclusion

For the reasons stated above, the motion for leave to amend will be granted, the motion to supplement will be denied, the motion to dismiss for failure to state a claim will be denied as moot, and the motion to dismiss for lack of personal jurisdiction will be granted.


_____9/24/14_____

Date

_____

William D. Quarles, Jr.
United States District Judge